Dunkin, Ch.
delivered the opinion of the court.
This court concur entirely with the Chancellor on the subject of the negroes included in the bill of sale from the complainant to Elisha Jones, dated 24th April, 1838.— The complainant’s witness, Jonathan Watts, proves the circumstances of the transaction very satisfactorily.. He- says that the consideration of the bill of sale, tu wit, $1305 40, was made up of the note to the -estate of Wilson, for which Jones was surety, and a: note due by Hogan to Jones himself. Charity, as theMiof sale states, was about thirty-five years of a,ge, Grace, about thirty-three, Louisa, about four years old, and an infant, Mary, about six months old. This witness, Watts, says that Charity, if sound, was worth $500; but that she was unsound. “ The understanding of the parlies,” says he, “ when this instrument was executed, was, that Hogan, at the end -of the year, was to pay the purchase money of Grace and her children, $1220, and the $88 above referred to, and if he did so, he was to have the negroes again.”
Hogan failed altogether to pay the debt to Wilson’s estate, and in November, 1839, it was paid by Jones, amounting, then, with the interest, to $1354 06, and making the amount due by Hogan, including the $88 note, about $1500. This was in November, 1839, and explains perfectly the testimony of Dr. Myers and other witnesses. The conversation to which they allude was evidently in relation to this matter. It occurred, according to his testimony, just before Hogan went to be the overseer of Col. Peay, a few months before the negroes were taken from the possession of Hogan, “ one, two, three, or four months.” The bill expressly states that the *330 were taken from the defendant’s possession in February, 1840. The answer admits the allegation. There is no doubt that the complainant overlooked for Col. Peay in 1840, and Watts, complainant’s witness, testifies that Hogan told him, in the Spring of 1840, that the negroes had been taken from him. Dr. Myers says that in this conversation between Col. Peay, Jones and Hogan, Col. Peay stated his disposition to aid Hogan by paying, what was due to Jones. Witness thinks the amount alleged to be due was about $1600. Jones said “ he had no objection — that his necessities were such that he was compelled to have the money or the property soon.” An appointment was made for a meeting “ at Hogan’s house, to know whether Peay would pay the money for Hogan.”— Watts says that “in December or November, 1839, he heard Col. Peay tell Jones that he had examined into Hogan’s affairs, and found he was so much in debt that he could not relieve him.” Two months afterwards the negroes were taken into the possession of Jones, under his bill of sale, and there remained until his death in 1844. There can be no doubt that the claim of the complainant was barred by the Statute referred to in the decree. It was said the mortgage was not in writing. But the bill of sale — that which constituted the title, was in writing. It was only the defeasance, that on which the complainant relies, which was in parol; and the reasoning of the Chancellor is quite satisfactory on the point.
It becomes now necessary td inquire into the transaction which relates to the land and the negro Peter. The charge in the bill is that in February, 1835, the complainant being pressed by some debts, Elisha Jones, the defendant’s testator, agreed to advance money to relieve him, provided complainant would permit him “ to take into his possession a-negro boy named Peter, to work for the interest of five, hundred dollars of said money for two years, and confess a judgment for two thousand dollars, as a further indemnity” — that in April, 1835, he confessed the judgment, and delivered Peter into the possession of Jones. He states that in May, 1835, he, the complainant, went to Alabama, and did not return to this State until 25th December, 1836 — that, during his absence, his land, worth $1000, was sold by the Sheriff under some execution, and bought by Jones for $100 — that Jones told several persons at the sale that he had purchased the land from the complainant, and only bid in order to get a Sheriff’s title. Complainant avers that, at the end of the two years, he tendered the five hundred dollars for Peter, but that Jones refused to receive the money or deliver the negro, but said he would do so at some future time. The bill calls on *331 the defendants to discover the precise amount of money paid by the said Elisha Jones for the complainant. The interrogatory was the more proper because it had been previously alleged in the bill that the moneys advanced by Jones were paid through his agent, Wm. E. Hall, one of the defendants. In reply to this interrogatory the defendant, Hall, answers that on the 6th of April, 1835, he met the complainant in Camden, and, as the agent of Jones, paid off debts of the complainant, in the Sheriff’s office and elsewhere, to the amount of one thousand and sixty-seven dollars, and on the 27th April, paid the balance due on one of the debts of $245, making together $1312, besides some smaller debts of which he cannot state the particulars. Although the answer, thus far, is strictly evidence, yet it - is not very material, for the same is substantially established by other testimony hereafter to be noticed. The answer admits that the defendant’s testator did not mean to keep the land of the complainant at the bid made at the Sheriff’s sales, and admitting also the possession of Peter, says he was to be redeemed if the $500 was paid in January, 1837. But the answer proceeds with a statement that the land which was knocked off to Jones during complainant’s absence iii Alabama, was to be taken by Jones at $800 ; and further, that, soon after the return of the complainant from Alabama, to wit, early in January, 1837, a settlement took place between his testator, Jones, and the complainant — that the calculations were made by the defendant, Hall, in the presence of the parties — that the amount then ascertained to be due by Hogan to Jones was $1578 56 — that he was allowed $800 for the land, $500 for Peter, and certain other amounts specifically set forth by him for other articles of Hogan’s, purchased by Jones, and that a balance was thereupon ascertained to be due by Hogan to Jones of $88 33— that he speaks with accuracy, as he has the paper still in his possession on which the calculations were made.
We concur with the Chancellor, that the answer of the defendant is not evidence to establish the settlement. It remains then to inquire whether such settlement may be with propriety inferred from the other testimony in the cause. The letter from the complainant to E. Jones, dated Alabama, 28th October, 1836, seems to have entirely escaped the observation of the Chancellor, or was probably not given to him after the hearing of the cause. In that letter the complainant writes “ I am able to pay you $500 cash now, and will act the gem tleman with you; — you shall never lose a dollar on my account. You can take my land at $800, and I will pay you $500 in January — that will be $1300, and you will be so good *332 as to send my two negroes out to me any time in December so that J 'can get them in time to hire out, or put in a crop ; and what you do not make over of the balance I am as good as wheat for.” It cannot be doubted that this letter admitted an amount, then due to the person to whom it was addressed, exceeding thirteen hundred dollars. The letter was in reply to one which he had received on the day previous, as appears from the first part of it — “ You can take my land at $800” is, apparently, in reply to a proposal to that effect on the part of Jones. But the complainant’s witness, Watts, being examined by him to prove that he did not buy the land at Sheriff’s sale with an intention to keep it at his bid, testified that “after the sale of Hogan’s land by the Sheriff, he heard Jones say that the title of Hogan was not good, and that the Sheriff’s title would be better than one Hogan could make — that Jones said he was to allow Hogan $800 for the land. Jones told witness that he had bargained privately with Hogan for the land at the price of $800.” Another witness, Joel Dunn, testified that he heard Hogan say “the land of his was worth $1000, but that he had agreed to let Mr. Jones have it in a settlement, for $800.” The conversation took place in 1845. Hogan complained of Jones — said he was going to law, or was at law — “that Jones had got his property for nothing— that his land was worth $1000, but that he had let Jones have it in settlement for $800.” But on the subject of the land the Court can perceive neither contrariety nor discrepancy in the evidence. The letter of October, 1836, admitted an indebtedness of more thad $1300, and proposed or agreed that the land should be taken at $800 .in part payment. It is not alleged in the bill, it was not suggested by the complainant at any subsequent period, in Court or out of Court, that he had actually paid, in any other way, any part of the sum then acknowledged to be due to Jones. The latter, in possession of the Sheriff’s title, remains also in undisturbed and unchallenged possession of the land from 1836 until his death in 1844; and, for the first time, in May, 1845, his title is called in question by the institution of these proceedings. Then as to Peter. The complainant alleges that in January, 1837, he tendered the money and demanded the negro. It is very difficult to conceive why the complainant did not then insist on his rights. But the defendant ascribes the silence of the complainant to the fact that, in the alleged settlement of January, 1837, the complainant received credit for the value of Peter. Is this allegation confirmed? It will be recollected that at that time the complainant owned Charity as well as Peter; in his letter of October, 1836, he had requested *333 Jones to send out his two negroes. Another letter, or note, was adduced in evidence (not noticed in the decree) from the complainant to Jones, dated 15th December, 1837, eleven months after the alleged demand'by the complainant, and eleven months after the settlement in which defendant avers Peter became the absolute property of Jones, his testator.- — - The letter is sent by Charity, and in it the complainant writes, “I request you to be so good as to let me have Peter for the next year. As I have got to hire a hand — -I will give you your own price for him the next year.” adding that the testator, Jones, had hands enough for his land without Peter, and that Charity would be better satisfied if Peter was there with complainant; he concludes, “and I will give you a fair price for him, as I do take you to be one of my best friends,” &c. It is hard to suppose that this letter came from a man who supposed himself the owner of Peter, and that he was wrongfully detained from him by the person to whom it was addressed. But it is quite consistent with the supposition that, in January previous, the settlement had been made, and that Peter had then become the absolute property of Jones. It may not be an immaterial circumstance to remark that the balance of $88, which was alleged to have been found due by Hogan on the settlement in January, 1837, constituted, according to Watts’ testimony, one of the items of the consideration for the bill of sale of April, 1838. The evidence is very strong that a settlement was made in January, 1837, and that the value of Peter was included in it. But the complainant avers, and it will be assumed, has proved, that in January, 1837, he actually tendered the money to Jones and demanded the negro. On the refusal of the defendant’s testator the right ol the complainant was perfect either at law or in this Court. The complainant does not allege that any new contract was then made. If he held as mortgagee in possession, the complainant’s right would be barred in two years.— But if, as complainant avers, there was no mortgage, and that Jones was only to hold the negro for two,years for the interest of $500, complainant’s right of action accrued in January, 1837, and was barred in January, 1841, more than three years prior to the death of the testator. There are circumstances in the case which seem peculiarly to entitle the testator’s estate to the protection of this statute of repose. Wm. Sanders, the most important witness of the complainant, proves that “ he was at Jones’ in January or February, 1837. Dr. Hall (the defendant) was engaged in a calculation of some matters between Jones and Hogan. Hall was a good while engaged in the calculation. At the instance of Mr. Jones, *334 witness and Hogan called on Dr. Hall, and requested him to come up to Mr. Jones’ for the purpose of making the calculations above referred to. The calculations occupied some two or three hours, perhaps.” This is the exact period at which the defendant alleges he prepared the statement on which the settlement was made. The testator, Jones, lived for seven years afterwards, and the matter was never moved, although the complainant never lived at á greater distance than 25 miles, and during a part of the time, in the employment of an opulent and influential gentleman, who was disposed to befriend him. The grave closed on the principal party in the transaction, and the witness, who could alone give a satisfactory explanation of it, had become incompetent. The Court would be reluctant to infer that the complainant waited for this fortuitous conjunction in order to prefer this long standing claim, but he has availed himself of it, and cannot complain that he is made to abide the consequences of his delay.
It is ordered and decreed, that the decree of the circuit be reformed, and the bill dismissed.
Johnston, Ch. and Caldwell, Ch. concurred.
Harper, Ch. absent.

Decree reformed.